IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-150

No. COA20-364

Filed 20 April 2021

Chatham County, No. 18 CRS 50347

STATE OF NORTH CAROLINA

v.

WILLIE HENDERSON WOMBLE

Appeal by the State from order entered 13 January 2020 by Judge Allen Baddour in Chatham County Superior Court. Heard in the Court of Appeals 9 March 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Jeffrey B. Welty, for the State.*

*Patterson Harkavy LLP by Narendra K. Ghosh and Bradley J. Bannon and Thomas, Ferguson & Beskind, L.L.P by Jay H. Ferguson for defendant-appellee.*

TYSON, Judge.

¶ 1    The State appeals from an order granting Willie Henderson Womble's ("Defendant") motion to suppress DNA evidence. We reverse and remand.

## I. Background

¶ 2    Roy Brent Bullock was shot two times during a robbery and murdered while working at a Food Mart grocery store in Butner on 18 November 1975, as his thirteen-

year-old daughter watched through a glass cooler. The North Carolina State Bureau of Investigation ("SBI") and Police Officers investigating Bullock's murder developed a list of suspects known to be involved with suspected robberies in the area. Joseph Perry, Albert Willis, and Defendant's names were on that list of suspects.

¶ 3        Durham Police Detective Lorenzo Leathers ("Detective Leathers") interviewed Defendant on matters unrelated to the Bullock homicide on 6 December 1975. Defendant made a statement to Detective Leathers about an "incident that happened over in Butner." Defendant allegedly named Perry as the shooter and corroborated the victim's statements before he died, and Bullock's daughter's testimony, that the shooter had worn, "a red and black or red and blue bandanna over the lower portion of his face." Defendant's statement was written down by Detective Leathers and was signed by Defendant. Later, Defendant's statement was typed and was again signed by Defendant. Defendant independently corroborated and acknowledged his statements the following day to SBI Agent Joseph Momier, without Detective Leathers present.

¶ 4        Detective Leathers testified Defendant was presented with three documents during the 6 December 1975 interrogation and the following day: a rights wavier form, a detailed confession handwritten by Detective Leathers, and the typewritten copy of the confession. Defendant's trial counsel did not challenge his waiver, move to suppress his confessions or Detective Leathers' testimony, nor objected when

Detective Leathers testified at trial.

Defendant's statement and confession indicated his involvement with Perry, Willis, and another individual, James "Boo Boo" Frazier with the robbery and Bullock's murder. Defendant stated Perry had given him twenty dollars to act as the "lookout" during the robbery and Bullock's murder.

Defendant testified on his own behalf at trial. He stated he had felt pressured to make the statements because the officers were "trying to blow their breath all in [his] face." Defendant also stated he was "high off beer" or under the influence when he made the confessions. Defendant presented two alibi witnesses. However, Defendant's purported alibi lost credibility after evidence of local television programming showed the testimony of his two alibi witnesses could not have been accurate.

The jury unanimously found Defendant guilty of first-degree felony murder and he was sentenced to life imprisonment on 7 July 1976. The Supreme Court of North Carolina unanimously found no error in his conviction. *See State v. Womble*, 292 N.C. 455, 233 S.E.2d 534 (1977) (Moore, J.).

Joseph Perry was tried for first-degree murder of Roy Brent Bullock on 3 and 4 November 1976. The State presented eyewitness testimony that Perry had shot a convenience store clerk in Durham two weeks before Bullock's murder. Shell casings recovered from both murder scenes were fired from the same gun. Perry was

convicted of first-degree murder and sentenced to life imprisonment on 4 November 1976.

## A. *State v. Bowden* and *Jones v. Keller*

¶ 9        In *State v. Bowden,* 193 N.C. App. 597, 600, 668 S.E.2d 107, 109 (2008), this Court held the Fair Sentencing Act, N.C. Gen. Stat. § 14-2 (1974), "treats [a] defendant's life sentence as an 80-year sentence for all purposes." Offenders sentenced pursuant to N.C. Gen. Stat. § 14-2 between 1974 and 1978 argued they were entitled to sentence reduction and "good time" and "gain time" credits, which rendered them eligible for immediate or imminent release. *Id.*

¶ 10        In preparation for this possible release of inmates affected by the ruling in *Bowden*, the North Carolina Department of Adult Correction ("DAC") took blood samples of all inmates. The blood samples were taken in compliance with N.C. Gen. Stat. § 15A-266.4 (2009) (person who "has been convicted and incarcerated as a result of a conviction. . . shall provide a DNA sample before parole or release from the penal system"). Defendant's blood sample was drawn without recorded objection on 28 October 2009 and was used to develop his DNA profile. Defendant's DNA profile was uploaded to the Federal Bureau of Investigation's Combined DNA Index System ("CODIS") on 2 February 2010.

¶ 11        The North Carolina Supreme Court later held the DAC's denial of a prisoner's "good time, gain time, and merit time for the purpose of unconditional release" from

life sentences imposed under Fair Sentencing has a rational basis. *Jones v. Keller*, 364 N.C. 249, 259-60, 698 S.E.2d 49, 58 (2010). Defendant remained in the custody of DAC under the judgment and sentence for life imprisonment entered on the jury's conviction for the Food Mart robbery and Bullock's murder.

## B. Innocence Inquiry

¶ 12    In 2013, Defendant's co-defendant, Joseph Perry, wrote the North Carolina Innocence Inquiry Commission ("Commission") admitting his own participation with Albert Willis in Bullock's murder, but asserted Defendant had not been involved. Perry told Commission staff that Willis was the only person with him during the murder and Defendant was not involved in any way. Commission staff interviewed Defendant, who asserted his innocence and applied to the Commission to review his case. Defendant repeated his rejected claims from trial that his confession was false, and he had an alibi.

¶ 13    The Commission gathered records indicating DAC had assessed Defendant's Intelligence Quotient ("IQ") at various levels between a 66 in 1977 to a 74 in 1998. Defendant was documented as having left school when he was 17, unsure of what grade he had completed "since he was in special education classes throughout his schooling." Defendant's records were inconsistent to the level of education attained, stating variously the 8th, 9th, or 11th grade. Defendant was diagnosed with a form of paranoid schizophrenia, was developmentally disabled, and has borderline

intellectual functioning. Defendant admitted he can read, write, perform simple mathematics, and "spell some five letter words."

¶ 14 Based upon Defendant's, Perry's, and the alibi witnesses' statements, the Commission unanimously found sufficient evidence of Defendant's innocence to merit judicial review. No member of law enforcement, the prosecution or Bullock's family testified before the Commission. The three-judge panel held a hearing to review Defendant's claim of innocence on 2 and 3 June 2014. *See* N.C. Gen. Stat. § 15A-1469(a) (2019). Before the three-judge panel, the current district attorney of Granville County, who had no previous connection to Defendant's trial, conceded the unconstitutionality of his confession. Defendant's counsel argued his client was mentally handicapped, had been forced by Detective Leathers to sign a confession he did not understand, and asserted Detective Leathers had committed perjury during Defendant's trial.

¶ 15 Detective Leathers had testified at the original trial he did not "have any idea about" the Bullock murder prior to Defendant's interview on 6 December 1975. Regarding the 6 and 7 December 1975 interviews, Detective Leathers testified Defendant could read and write, had waived his rights, and had read and understood the confession before he knowingly signed it.

¶ 16 Evidence was produced during the Commission's hearing tending to show Detective Leathers had met with SBI Agent Joseph Momier and Butner Public Safety

Officer Nelson Williams on 19 November 1975 to develop possible suspects.

The Commission found Defendant was "illiterate" "for all practical purposes." The three-member panel of superior court judges was appointed by Chief Justice Sarah E. Parker, consisting of Judges Vance Bradford Long, Phyllis M. Gorman, and J. Carlton Cole. Relying on the Commission's record and without taking additional evidence, the panel unanimously concluded Defendant had proven his innocence by clear and convincing evidence and ordered his immediate release on 17 October 2014. Defendant was freed by the DAC pursuant to the 17 October 2014 order.

## C. Todd Homicide Investigation

Two and one-half years later, a social worker assisting Pittsboro resident, Donna Todd, reported to the Pittsboro Police Department on 11 April 2017 that she had not heard from Todd in over a week. Officer Franks and Detective Clarence Johnson went to Todd's apartment at the Creekside Apartments to conduct a well-being status check.

Upon opening the door, the police officers found Todd's partially decomposed body lying face-down on the floor of the apartment, approximately four feet from the door. A pair of scissors were protruding from the back of Todd's head near her left ear. She had been stabbed at least seven times and cut more than five times in her head, neck, and upper back. Todd had also suffered two broken ribs. The autopsy concluded she died from "multiple sharp and blunt force injuries."

¶ 20      The apartment was in disarray and had papers strewn throughout.  A large spot of blood was observed on the floor near the couch in the living room, a tray had been knocked over, and bi-fold doors going toward the bedroom were knocked down. A woman's wallet with blood on it was found on top of an ottoman.  Officers observed a broken lamp on the floor near the couch with stains that appeared to be blood thereon.  Officers also found a beer can in the apartment.

¶ 21      The officers concluded the conditions inside the apartment indicated a struggle had occurred in several rooms.  A bent knife, wallet, beer can, lamp, and other items from the apartment were collected and taken into evidence.

¶ 22      Officers conducted a neighborhood canvas of residents of Creekside Apartments.  Defendant and his then-girlfriend, Lynn Myrie, also lived in the Creekside Apartments.  Both initially denied knowing Todd or having contact with her.  Defendant told officers he thought Todd's boyfriend was "Mr. Hooks" or "Hooky," a man later identified as Thel Riley.

¶ 23      Defendant later admitted he had provided Todd with cigarettes up until four months prior to her murder.  Defendant also admitted he would occasionally give Todd a ride to the Piggly Wiggly grocery store.  Defendant said these contacts had stopped after Todd had told Myrie "he [Defendant] was trying to get with her."

¶ 24      On 3 May 2017, the Pittsboro Police Department submitted the items recovered from the crime scene to the State Crime Lab.  The State Crime Lab

confirmed the stain on the broken lamp was human blood. The State Crime Lab was able to obtain a DNA profile from the blood on the lamp and submitted it to CODIS. A beer can seized from the apartment did not return a CODIS match. The State Crime Lab learned the DNA profile from the broken lamp matched Defendant's profile drawn on 28 October 2009 by DAC.

¶ 25 The State Crime Lab performed a confirmatory analysis by retesting Defendant's profile taken 28 October 2009. The confirmatory analysis also validated the DNA match of the blood on the lamp with Defendant. The State Crime Lab reviewed Defendant's criminal record and learned the first-degree murder conviction for which he was incarcerated when the 28 October 2009 sample was drawn had been dismissed.

¶ 26 The State Crime Lab's legal counsel believed Defendant's sample should be excluded from CODIS because the underlying conviction necessitating the sample had been dismissed. As a result, the State Crime Lab did not notify the Pittsboro Police Department of the CODIS match of the blood on the lamp to Defendant's DNA. The investigation had eliminated Riley as a suspect in Todd's murder and the investigation continued into other residents at the Creekside Apartments.

¶ 27 On 15 April 2017, an anonymous caller contacted the Pittsboro Police Department and reported and identified Defendant as Todd's killer. The anonymous caller explained Todd had confronted Defendant for "hitting on her." Todd had

informed Myrie of Defendant's advances. Defendant became upset at Todd for telling Myrie of his actions, and he had wanted to "get" Todd. The identity of the anonymous caller was later identified in discovery requested by Defendant to be a close relative of Defendant.

¶ 28      Joseph Alibrandi, Todd's stepfather, had spoken to Todd shortly before her murder near the end of March 2017. Albrandi reported Todd had told him about a person living in her apartment complex who was "trying to hit on her" which was "causing her some distress."

¶ 29      Police responded to six reports of disturbances or assaults by Defendant and Myrie between March 2017 and August 2017. In a 911 recording, Defendant was heard yelling "If I go to jail again . . . I will kill your muthaf---n' ass." and "If I go to jail again . . . it's going to be for muthaf---n' murder."

¶ 30      On 29 November 2017, the State Crime Lab notified the Pittsboro Police Department that Defendant's DNA sample matched the DNA recovered from the blood on the lamp. Detective Johnson re-interviewed Defendant, wherein Defendant denied ever having been inside Todd's apartment. Defendant refused to provide a voluntary DNA sample.

¶ 31      Officers obtained a search warrant for a new DNA sample from Defendant on 23 January 2018. Detective Johnson's affidavit for the search warrant "acknowledge[d] that the conviction associated with the DNA sample in the CODIS

database was later overturned, that no other qualifying event had occurred, but that the State Crime Lab had not received an order for expunction."

¶ 32 Officers executed the search warrant on 24 January 2018. On 7 February 2018, the State Crime Lab found a profile from the blood on the broken lamp was consistent with the DNA profile taken from Defendant's 24 January 2018 sample. The State Crime Lab found Defendant could not be excluded as a contributor of the DNA found on other DNA profiles from blood on the broken lamp and the stained wallet. On 28 February 2018, Defendant was charged with first-degree murder.

¶ 33 Defendant filed a motion to suppress the DNA evidence obtained from him and all evidence obtained as a result of the 23 January 2018 search warrant. The trial court held an evidentiary hearing on 14 and 15 May 2019 and final oral arguments on 4 September 2019 on the motion to suppress. Defendant and the State both submitted post-hearing briefs to the trial court.

¶ 34 Before the trial court, Defendant argued the evidence should be suppressed because: (1) it was obtained as a result of the unconstitutional coercion of Defendant's 6 and 7 December 1975 confession to the Bullock murder; (2) obtained as a result of a warrantless search in 2017 conducted without exigent circumstances; and, (3) Defendant's counsel failure to petition for expungement of his DNA records during Defendant's innocence hearing on 2 and 3 June 2014 constituted ineffective assistance of counsel.

The trial court found and concluded Defendant's DNA was lawfully seized in 2009 and retained by the State, and the attorneys, who had represented Defendant on his innocence proceedings, did not provide him ineffective assistance of counsel. However, the trial court allowed Defendant's motion to suppress.

The trial court held the General Assembly "could . . . have chosen to make expunction automatic in the course of exonerations or reversals of convictions, but did not and instead place[d] the burden of seeking expungement on the defendant," and ordered the DNA evidence to be excluded. Without being asserted or briefed by either Defendant or the State, the trial court concluded this lack of "expunction automatic in the course of exonerations or reversals" places "an unconstitutional burden on the defendant" in violation of the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution. The State filed timely notice of appeal.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 15A-979(c) and 15A-1445 (2019) from the State's appeal of the superior court's order granting Defendant's motion to suppress.

## III. Issue

The State argues the trial court erred in granting Defendant's motion to suppress.

## IV. Standard of Review

¶ 39 "The standard of review for a motion to suppress is whether the trial court's findings of fact are supported by the evidence and whether the findings of fact support the conclusions of law." *State v. Wainwright*, 240 N.C. App. 77, 83, 770 S.E.2d 99, 104 (2015) (internal quotation marks and citation omitted). "[I]n evaluating a trial court's ruling on a motion to suppress . . . the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Allen*, 197 N.C. App. 208, 210, 676 S.E.2d 519, 521 (2009) (citation omitted).

¶ 40 Findings of fact not challenged on appeal are deemed supported by competent evidence and are binding upon this Court. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

**V. Law of the Land Clause**

¶ 41 The State does not challenge any of the findings of fact made by the trial court in the order granting Defendant's motion to suppress. These findings are binding upon appeal. *Biber*, 365 N.C. at 168, 712 S.E.2d at 878.

**A. Preservation**

¶ 42 The State argues the trial court erred in granting Defendant's motion to suppress. It asserts the basis for allowing the motion, the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution, was not specifically argued

before the trial court. The State asserts appellate review is barred because that specific reason was not raised before the trial court.

¶ 43    Before the trial court, Defendant's attorney argued for the motion to suppress "because 15A-266.4 violates the State Constitution and the Fourth Amendment." Defendant also argued his innocence hearing counsel provided ineffective assistance by failing to petition for expungement upon his exoneration.

¶ 44    "[W]here a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount in the appellate courts." *State v. Holliman,* 155 N.C. App. 120, 123, 573 S.E.2d 682, 685 (2002) (citations and internal quotation marks omitted). Our Appellate Rules provide: "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. 10(a)(1).

¶ 45    Rule 10(a)(1) applies to constitutional challenges. *See State v. Valentine*, 357 N.C. 512, 525, 591 S.E.2d 846, 857 (2003). Our Supreme Court and this Court have consistently denied appellate review of unpreserved constitutional issues. *See State v. Golphin*, 352 N.C. 364, 403-04, 533 S.E.2d 168, 197 (2000) ("This Court is not required to pass upon a constitutional issue unless it affirmatively appears that the issue was raised and determined in the trial court." (citation omitted)). "It is well

settled that an error, even one of constitutional magnitude, that defendant does not bring to the trial court's attention is waived and will not be considered on appeal." *State v. Bursell*, 372 N.C. 196, 199, 827 S.E.2d 302, 305 (2019) (citation omitted).

¶ 46        N.C. Gen. Stat. § 15A-977(a) provides "the motion to suppress must state the grounds upon which it is made." N.C. Gen. Stat. § 15A-977(a) (2019).

¶ 47        In *State v. Harvey*, 78 N.C. App. 235, 237, 336 S.E.2d 857, 859 (1985), the defendant argued in his motion to suppress the confession was involuntary. The trial court allowed a motion to suppress because the police failed to give the *Miranda* warnings prior to custodial interrogation. *Id.* This Court held "[t]he decision to deny summarily a motion which fails to set forth adequate legal grounds is vested in the sound discretion of the trial court." *Id.*

¶ 48        This Court applied *Harvey* in *State v. Colbert*, 146 N.C. App. 506, 553 S.E.2d 221 (2001). There, a trial court allowed a motion to suppress in a driving while impaired case on a ground not specifically raised by the defendant in his motion to suppress. *Id.* at 507, 553 S.E.2d at 223. This Court held: "Once the trial court decides not to dismiss the motion but rather to have a hearing, the court may base its conclusion on grounds other than those set forth in the motion." *Id.* at 508, 553 S.E.2d at 223 (citation omitted).

¶ 49        Rule 28 of the North Carolina Rules of Appellate Procedure states: "an appellee may present issues on appeal based on any action or omission of the trial court that

deprived the appellee of an alternative basis in law for supporting the judgment, order, or other determination from which appeal has been taken." N.C. R. App. P. 28(c). "Our precedents clearly allow the party seeking to *uphold* the trial court's presumed-to-be-correct and ultimate ruling to, in fact, choose and run *any* horse to race on appeal to sustain the legally correct conclusion of the order appealed from." *State v. Hester*, 254 N.C. App. 506, 516, 803 S.E.2d 8, 16 (2017) (emphasis original) (citations and internal quotation marks omitted).

¶ 50 The trial court acted within its inherent power to consider the motion to suppress and to grant on grounds or reasons not specifically argued below by Defendant or the State. The ruling is preserved for appellate review. N.C. R. App. P. 28(c).

## B. Eligibility for Expungement

¶ 51 To address the parties' arguments regarding Defendant's eligibility for expungement, we review N.C. Gen. Stat. §§ 15A-146 and 15A-148. In reviewing these statutes, we are guided by several well-established principles and precedents of statutory construction.

¶ 52 "The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citation omitted). "The best indicia of that intent are the language of the statute . . . , the spirit of the act and what the act seeks to accomplish." *Coastal Ready-Mix Concrete*

*Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citation omitted).

¶ 53     "When construing legislative provisions, this Court looks first to the plain meaning of the words of the statute itself[.]" *State v. Ward*, 364 N.C. 157, 160, 694 S.E.2d 729, 731 (2010).   "Where a statute contains two clauses which prescribe its applicability, and the clauses are connected by the disjunctive, application of the statute is not limited to cases falling within both clauses, but applies to cases falling within either one of them." *Grassy Creek Neighborhood Alliance, Inc. v. City of Winston-Salem*, 142 N.C. App. 290, 297, 542 S.E.2d 296, 301 (2001) (citations omitted).

¶ 54     "[S]tatutes *in pari materia* must be read in context with each other." *Cedar Creek Enters. Inc. v. Dep't of Motor Vehicles*, 290 N.C. 450, 454, 226 S.E.2d 336, 338 (1976).   "Interpretations that would create a conflict between two or more statutes are to be avoided, and statutes should be reconciled with each other whenever possible." *Taylor v. Robinson*, 131 N.C. App. 337, 338, 508 S.E.2d 289, 291 (1998) (internal quotation marks, citations, and alterations omitted).

¶ 55     Further, our Supreme Court has held, "where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control[.]" *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (citation

omitted).

¶ 56          N.C. Gen. Stat. § 15A-148 addresses orders of expunction and provides:

> (a) *Upon a motion by the defendant following the issuance of a final order by an appellate court reversing and dismissing a conviction of an offense for which a DNA analysis was done in accordance with Article 13 of Chapter 15A of the General Statutes,* or upon receipt of a pardon of innocence with respect to any such offense, the court shall issue an order of expungement of the DNA record and samples in accordance with subsection (b) of this section. The order of expungement shall include the name and address of the defendant and the defendant's attorney and shall direct the North Carolina State Crime Laboratory to send a letter documenting expungement as required by subsection (b) of this section.
>
> (b) When an order of expungement has been issued pursuant to subsection (a) of this section, the order of expungement, together with a certified copy of the final appellate court order reversing and dismissing the conviction or a certified copy of the instrument granting the pardon of innocence, shall be provided to the North Carolina State Crime Laboratory by the clerk of court. Upon receiving an order of expungement for an individual whose DNA record or profile has been included in the State DNA Database and whose DNA sample is stored in the State DNA Databank, the DNA profile shall be expunged and the DNA sample destroyed by the North Carolina State Crime Laboratory, except that the order shall not apply to other offenses committed by the individual that qualify for inclusion in the State DNA Database and the State DNA Databank. A letter documenting expungement of the DNA record and destruction of the DNA sample shall be sent by the North Carolina State Crime Laboratory to the defendant and the defendant's attorney at the address specified by the court in the order of expungement. . . .
>
> (c) *Any petition for expungement* under this section shall be on a form approved by the Administrative Office of

the Courts and be filed with the clerk of superior court. Upon order of expungement, the clerk shall forward the petition to the Administrative Office of the Courts.

N.C. Gen. Stat. § 15A-148 (2019) (emphasis supplied).

¶ 57        N.C. Gen. Stat. § 15A-148 allows a defendant to petition for expungement of their "DNA record and samples," "following the issuance of a final order by an appellate court reversing and dismissing a conviction of an offense for which a DNA analysis was done" or "upon receipt of a pardon of innocence." *Id.* The trial court concluded the statute violated the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution for not mandating automatic expunction upon Defendant's exoneration and granted Defendant's motion to suppress.

¶ 58        Defendant failed to petition to have his DNA record expunged. The State argues Defendant was not eligible for expungement because an "appellate court" did not dismiss Defendant's conviction. Defendant argues the State has waived this argument by not arguing it before the trial court. As asserted above, the trial court decided the motion on a basis not argued before it. At this Court, the State argued and briefed the results of the DNA tests should be allowed in the upcoming trial under N.C. Gen. Stat. § 15A-148. Alternatively, and in the exercise of our discretion, we invoke Rule 2 of the Rules of Appellate Procedure to review this argument. N.C. R. App. P. 2.

¶ 59        N.C. Gen. Stat. § 15A-148(a) contains two clauses in the disjunctive. Neither applies to Defendant. Defendant received a dismissal of the first-degree felony-murder conviction from the three-judge panel, based upon the recommendation of the Commission and the stipulation of the Granville County District Attorney. At oral argument, Defendant's counsel conceded Defendant did not receive a "pardon of innocence" and asserted we should construe that the three-judge superior court panel constitutes an "appellate court" under N.C. Gen. Stat. § 15A-148. Defendant asserts the three-judge panel is an appellate court because it was the court commissioned by Chief Justice Parker to review his 1976 conviction for the felony-murder of Bullock.

¶ 60        After the Commission's finding of sufficient evidence of factual innocence to merit judicial review, the Chief Justice appoints a three-judge panel to "convene a special session of the superior court of the original jurisdiction [of the case] to *hear evidence* relevant to the Commission's recommendation. N.C. Gen. Stat. § 15A-1469(a) (2019) (emphasis supplied) (The trial court applied N.C. Gen. Stat. § 15A-1469 (2019), which was amended effective 1 December 2019 by N.C. Gen. Stat. §15A-1469 (Supp. 2020)). "The three-judge panel *shall conduct* an evidentiary hearing." N.C. Gen. Stat. § 1469(d) (2019) (emphasis supplied). This Court has consistently held: "An appellate court does not sit as the finder of fact." *State v. Crews*, 66 N.C. App. 671, 675, 311 S.E.2d 895, 897 (1984). Unlike when the superior court sits as an appellate court reviewing the actions of a county or municipality zoning board on a

closed record, the three-judge panel is tasked under the statute to "hear[ing] evidence relevant to the Commission's recommendation." N.C. Gen. Stat. § 15A-1469(a).

¶ 61    The State asserts Defendant is also ineligible for expunction under N.C. Gen. Stat. § 15A-146 (2019). N.C. Gen. Stat. § 15A-146 provides, *inter alia*:

> (a) If any person is charged with a crime, either a misdemeanor or a felony, or was charged with an infraction under G.S. 18B-302(i) prior to December 1, 1999, and the charge is dismissed, that person may petition the court of the county where the charge was brought for an order to expunge from all official records any entries relating to his apprehension or trial. The court shall hold a hearing on the petition and, upon finding that the person had not previously been convicted of any felony under the laws of the United States, this State, or any other state, the court shall order the expunction. . . .
>
> (a1) Notwithstanding subsection (a) of this section, if a person is charged with multiple offenses and the charges are dismissed, then a person may petition to have each of the dismissed charges expunged. The court shall hold a hearing on the petition. *If the court finds that the person had not previously been convicted of any felony under the laws of the United States, this State, or any other state, the court shall order the expunction.*
>
> (a2) If any person is charged with a crime, either a misdemeanor or a felony, or an infraction under G.S. 18B-302(i) prior to December 1, 1999, and a finding of not guilty or not responsible is entered, that person may petition the court of the county where the charge was brought for an order to expunge from all official records any entries relating to apprehension or trial of that crime. The court shall hold a hearing on the petition and upon finding that the person had not previously been convicted of any felony under the laws of the United States, this State, or any other

state, the court shall order the expunction. . . . If a person is charged with multiple offenses and findings of not guilty or not responsible are made on charges, then a person may petition to have each of the charges disposed by a finding of not guilty or not responsible expunged. The court shall hold a hearing on the petition. If the court finds that the person had not previously been convicted of any felony under the laws of the United States, this State, or any other state, the court shall order the expunction.

. . . .

(b1) Any person entitled to expungement under this section may also apply to the court for an order expunging DNA records when the person's case has been dismissed by the trial court and the person's DNA record or profile has been included in the State DNA Database and the person's DNA sample is stored in the State DNA Databank. A copy of the application for expungement of the DNA record or DNA sample shall be served on the district attorney for the judicial district in which the felony charges were brought not less than 20 days prior to the date of the hearing on the application. If the application for expungement is granted, a certified copy of the trial court's order dismissing the charges shall be attached to an order of expungement. The order of expungement shall include the name and address of the defendant and the defendant's attorney and shall direct the North Carolina State Crime Laboratory to send a letter documenting expungement as required by subsection (b2) of this section.

(b2) Upon receiving an order of expungement entered pursuant to subsection (b1) of this section, the North Carolina State Crime Laboratory shall purge the DNA record and all other identifying information from the State DNA Database and the DNA sample stored in the State DNA Databank covered by the order, except that the order shall not apply to other offenses committed by the individual that qualify for inclusion in the State DNA

> Database and the State DNA Databank. A letter documenting expungement of the DNA record and destruction of the DNA sample shall be sent by the North Carolina State Crime Laboratory to the defendant and the defendant's attorney at the address specified by the court in the order of expungement.

N.C. Gen. Stat. § 15A-146 (emphasis supplied) (The trial court applied N.C. Gen. Stat. § 15A-146 (2019), which was amended effective 1 December 2020 by N.C. Gen. Stat. §15A-146 (Supp. 2020)).

¶ 62 Defendant had two prior felony convictions for larceny and a felony conviction for breaking and entering unaffected by the dismissal of his prior murder conviction. Under the plain language of N.C. Gen. Stat. § 15A-146, Defendant is not entitled to an expungement.

¶ 63 The State further argues Defendant was not eligible for expungement because N.C. Gen. Stat. § 15A-148(b) provides "except that the order [to expunge] shall not apply to other offenses committed by the individual that qualify for inclusion in the State's DNA Database and the State DNA Databank." N.C. Gen. Stat. § 15A-148(b).

¶ 64 Defendant argues the State has not preserved this argument for appellate review. Before the trial court, the State presented Defendant's certified prior criminal record. In addition to the first-degree felony murder conviction, Defendant had been convicted of multiple counts of larceny, burglary of habitation, larceny from auto, burglary forced entry non-residential, larceny from a building, burglary forced

entry non-residential store breaking, larceny from a building, and passing forged checks. Defendant pleaded guilty to two counts of felony larceny and two counts of misdemeanor larceny.

¶ 65    Before the trial court, the State conceded "None of these prior arrests or convictions would have triggered the collection of the DNA of [Defendant] under the law at the time of arrest, conviction, or incarceration." "Our precedents clearly allow the party seeking to uphold the trial court's presumed-to-be-correct" order to "run any horse to race on appeal to sustain the legally correct conclusion of the order appealed." *Hester*, 254 N.C. App. at 516, 803 S.E.2d at 16. "The law does not permit parties to swap horses between courts in order to get a better mount in the appellate courts." *State v. Shelly*, 181 N.C. App. 196, 206-07, 638 S.E.2d 516, 525 (2007). The State, as appellant seeking to overturn the trial court's order, cannot now assert the Defendant's prior felony convictions would nullify application of N.C. Gen. Stat. § 15A-148.

¶ 66    The 28 October 2009 sample was lawfully collected from Defendant in 2009 while he was incarcerated under a judgment entered upon a unanimous jury's verdict for first-degree felony murder, and was reviewed with no error by a unanimous Supreme Court. As the trial court properly found and concluded, this random blood draw during incarceration was both lawfully taken and maintained pursuant to the

authority in N.C. Gen. Stat.§ 15A-266.4 (2019). That portion of the trial court's order is affirmed.

¶ 67    Defendant was not eligible for expulsion or expungement of the DNA sample under either N.C. Gen. Stat. §§ 15A-146 or 15A-148.

## C. Automatic Expungement

¶ 68    The trial court granted Defendant's motion to suppress, holding the statute not authorizing automatic expunction upon Defendant's exoneration was constitutionally deficient and prejudicial in violation of the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution.

¶ 69    N.C. Gen. Stat. § 15A-148 allows a defendant to petition for expungement of their "DNA record and samples" "upon receipt of a pardon of innocence." N.C. Gen. Stat. § 15A-148. Federal law requires all states participating in CODIS to establish expungement provisions. 34 U.S.C. § 12592 (d)(2)(A) (2018). 34 U.S.C. § 12592 does not specify the specific procedure states must establish for participation in CODIS.

¶ 70    Our General Assembly places the burden on the defendant to petition to initiate the expungement proceedings. In *State v. Swann*, this Court examined a defendant's petition to expunge his DNA record. *State v. Swann*, 197 N.C. App. 221, 222, 676 S.E.2d 654, 656 (2009). The defendant offered his petition as evidence at his motion to suppress. *Id.* This Court affirmed the trial court, wherein the defendant was attempting to "retroactively expunge his DNA records after they had been used

by law enforcement to identify him as the perpetrator in a number of crimes." *Id.* at 224, 676 S.E.2d at 657.

¶ 71        This Court further reasoned expungement of a record extinguishes a record as if it never existed, but "this only occurs *after* the order of expunction has been entered." *Id.* (emphasis original). "[T]he intent of the legislature that the effect of the expunction is prospective only." *Id.* The expungement statute, N.C. Gen. Stat. § 15A-148, is prospective only, not retrospective.

¶ 72        Defendant's murder charge was dismissed by the 17 October 2014 order. Defendant was not eligible to have his 28 October 2009 sample automatically destroyed and the corresponding DNA profile expunged from CODIS. Our General Assembly places this burden on the individual to petition, as is directed by 42 U.S.C. § 14132. The trial court held this affirmative burden placed an "unconstitutional burden on the defendant" in violation of the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution. At no time at his earlier trial, before the trial court, or this Court does Defendant assert he was incompetent or offer any basis to support his inaction.

¶ 73        Article I, Section 19 of the North Carolina Constitution provides, *inter alia*: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art I, § 19. The Law of the Land

Clause has been held to be the equivalent of the Fourteenth Amendment's Due Process Clause. *See State v. Collins*, 169 N.C. 323, 32[4], 84 S.E. 1049, 1050 (1915).

"[A] decision of the United States Supreme Court interpreting the Due Process Clause is persuasive, though, not controlling authority for interpretation of the Law of the Land Clause." *Evans v. Cowan*, 132 N.C. App. 1, 6, 510 S.E.2d 170, 174 (1999) (citation omitted). Our Supreme Court has "reserved the right to grant Section 19 relief against unreasonable and arbitrary state statutes in circumstances where relief might not be obtainable under the Fourteenth Amendment to the United States Constitution." *In re Meads*, 349 N.C. 656, 671, 509 S.E.2d 165, 175 (1998) (citation omitted).

The constitutional inquiry under the Law of the Land Clause is: "(1) Does the regulation have a legitimate objective; and (2) if so, are the means chosen to implement that objective reasonable?" *Id.* (citations omitted). The government's interest in preserving an identification record of convicted felons for resolving past or future crimes is a legitimate government objective. *See Maryland v. King*, 569 U.S. 435, 453, 186 L. Ed. 2d 1, 24 (2013).

The second prong of the Law of the Land Clause inquiry is also met, N.C. Gen. Stat. § 15A-266.4 provides for the collection of DNA evidence from an inmate prior to release. Under the circumstances articulated in N.C. Gen. Stat. §§ 15A-146 and 15A-148, a defendant can petition for samples to be destroyed and DNA profiles to be

expunged from CODIS.

¶ 77 The trial court's suppression of the DNA evidence based upon the Law of the Land Clause denied the longstanding presumption of validity of legislative policy choices and is error. The application of N.C. Gen. Stat. § 15A-148 is presumed to be, and is, constitutional under the Law of the Land Clause. *In re* Meads, 349 N.C. at 671, 509 S.E.2d at 175. The trial court's order concluding otherwise is reversed.

## VI. Due Process

¶ 78 Defendant and the State present additional arguments, which are likely to re-occur on remand. Defendant argues the trial court's order suppressing the DNA evidence should be alternatively affirmed because the evidence violates the Due Process Clause of the Fourteenth Amendment. The trial court's order did not find and conclude the taking of or maintaining the results of the blood sample as unconstitutional under the Due Process Clause.

¶ 79 "Due Process provides two types of protection for individuals against improper government action." *State v. Fowler*, 197 N.C. App. 1, 20, 676 S.E.2d 523, 540 (2009) (citation and internal quotation marks omitted). The "two types" of protection are procedural and substantive due process. *Id.* "Substantive due process is a guaranty against arbitrary legislation, demanding that the law shall not be unreasonable, arbitrary or capricious, and that the law be substantially related to the valid object sought to be obtained." *State v. Joyner*, 286 N.C. 366, 371, 211 S.E.2d 320, 323 (1975).

"Substantive Due Process protection prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998) (citations and internal quotation marks omitted).

"Procedural due process protection ensures that when the government action deprives a person of life, liberty, or property survives substantial due process review, that action is implemented in a fair manner." *Id.* (citations and internal quotation marks omitted).

Our Supreme Court has held:

> because the United States Constitution is binding on the states, the rights *it* guarantees must be applied to every citizen by the courts of North Carolina, so no citizen will be "accorded lesser rights" no matter how we construe the state Constitution. For all practical purposes, therefore, the only significant issue for this Court when interpreting a provision of our state Constitution paralleling a provision of the United States Constitution will always be whether the state Constitution guarantees additional rights to the citizen above and beyond those guaranteed by the parallel federal provision. In this respect, the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution.

*State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998) (emphasis original).

As noted above, the Law of the Land Clause is North Carolina's constitutional

equivalent of the Fourteenth Amendment's Due Process Clause. *See Collins*, 169 N.C. at 32[4], 84 S.E. at 1050. Our Supreme Court has read our Law of the Land Clause to provide greater protection than the Due Process Clause of the Fourteenth Amendment. *See In re Meads*, 349 N.C. at 671, 509 S.E.2d at 175 (citation omitted).

¶ 83        As the trial court and we held above, the 28 October 2009 DNA blood sample taken from Defendant and test results retained by the State and CODIS did not violate his rights under the Law of the Land Clause. Because the Law of the Land Clause provides greater protections for North Carolina citizens than the floor of the Due Process Clause, no due process violation occurred here. Defendant's argument is overruled.

¶ 84        Defendant filed a memorandum of additional authority in accordance with Rule 28 of the North Carolina Rules of Appellate Procedure and argued the Supreme Court of the United States decision in *Nelson v. Colorado*, __ U.S. __, 197 L. Ed. 2d 611 (2017) as an alternative ground to uphold the trial court's suppression order of the confirmatory test of Defendant's blood sample. Presuming without deciding, Defendant's blood draw was of similar character as the fines, fees, and restitution at issue in *Nelson*, and Defendant was entitled to its return after the dismissal of his murder conviction, Defendant fails to show any petition for the return of his property (blood).

¶ 85        In rejecting Colorado's statutory scheme as being in violation of Nelson's Due

Process rights, the Supreme Court of the United States also held: "[t]o comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Id.* at __, 197 L. Ed. 2d at 620. Without petition to return his property, Defendant, unlike in *Nelson*, did not invoke the statutory minimum procedure. Defendant did not argue this basis before the trial court and his failure to request the return of his blood as an exaction of his invalidated conviction prevents us from considering the matter as a violation of his federal Due Process rights. Defendant's argument is dismissed.

## VII. Coercion

Defendant argues this Court should affirm the trial court's order suppressing the DNA sample because his confession was obtained by coercion by Detective Leathers and that Detective Leathers committed perjury during Defendant's trial. Defendant asserts the exclusionary rule mandates suppression because the confession was fruit of the poisonous tree.

The "fruit of the poisonous tree doctrine" provides for application of the exclusionary rule "[w]hen evidence is obtained as the result of illegal police conduct, not only should that evidence be suppressed, but all evidence that is the 'fruit' of that unlawful conduct should be suppressed." *State v. Pope*, 333 N.C. 106, 113-14, 423 S.E.2d 740, 744 (1992) (citations omitted). However, the Supreme Court of the United States has held: "while the government should not profit from its illegal activity,

neither should it be placed in a worse position than it would otherwise have occupied." *Murray v. United States*, 487 U.S. 533, 542, 101 L. Ed. 2d 472, 483 (1988). This "independent source doctrine" is an exception to the exclusionary rule when "a later, lawful seizure is genuinely independent of an earlier, tainted one." *Id.* "[T]he independent source doctrine provides that evidence obtained illegally should not be suppressed if it is later acquired pursuant to a constitutionally valid search or seizure." *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006).

¶ 88        Neither the trial judge, jury, the original Supreme Court's unanimous opinion, the Commission, nor the three-superior court judge panel found any misconduct by Detective Leathers. The basis for the finding of innocence was the testimony by Joseph Perry, who waited thirty-seven years, and until after the deaths of his co-defendant, Willis, and Detective Leathers, to assert his exculpation of Defendant. The three-judge panel's ruling is not based upon an assertion of a finding of fruit of the poisonous tree.

¶ 89        Defendant has made no showing to support any coercion by Detective Leathers. As an alternative basis to dismiss his claim, Defendant provided a version of his confession to Agent Momier and Detective Tony Roop on 14 December 1975. This independent source of Defendant's confession is apart from any alleged coercion of Defendant by Detective Leathers. This independent source prevents the application of the exclusionary rule. Because Defendant's confessions and the subsequent

evidence were not fruit of the poisonous tree, we need not address the State's attenuation argument, which is unlikely to occur on remand. Defendant's argument is without merit and dismissed.

## VIII. Warrantless Search

¶ 90    Defendant argues the DNA profile created from his 28 October 2009 sample constituted a warrantless search conducted without exigent circumstances. We review the applicability of the Fourth Amendment to Defendant's arguments.

¶ 91    "The Fourth Amendment to the United States Constitution protects individuals 'against unreasonable searches and seizures[.]' " *McKinney*, 361 N.C. at 57, 637 S.E.2d at 871 (quoting U.S. Const. amend. IV). "The Fourth Amendment protects against governmental invasions into a person's legitimate expectation of privacy, which has two components: (1) the person must have an actual expectation of privacy, and (2) the person's subjective expectation must be one that society deems to be reasonable." *State v. Wiley*, 355 N.C. 592, 602, 565 S.E.2d 22, 32 (2002) (citing *Smith v. Maryland*, 442 U.S. 735, 740, 61 L. Ed. 2d 220, 226-27 (1979)). "Generally, a warrant is required for every search and seizure, with particular exceptions." *State v. Armstrong*, 236 N.C. App. 130, 132, 762 S.E.2d 641, 643 (2014) (citations omitted).

¶ 92    "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the

Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Ross*, 456 U.S. 798, 825, 72 L. Ed. 2d 572, 594 (1982) (citations and internal quotation marks omitted). "Searches conducted without warrants have been held unlawful notwithstanding facts unquestionably showing probable cause, for the Constitution requires that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police." *Katz v. United States*, 389 U.S. 347, 357, 19 L.Ed.2d 576, 585 (1967) (citations and internal quotation marks omitted).

¶ 93          In *Maryland v. King*, the Supreme Court of the United States reviewed a Fourth Amendment challenge to a Maryland statute authorizing the collection of DNA samples taken upon booking after arrest for certain crimes. *King*, 569 U.S. at 441, 186 L. Ed. 2d at 16. The defendant was arrested for both first and second-degree assault. Upon booking, his cheek was swabbed to obtain a DNA sample. *Id.* at 440, 186 L. Ed. 2d at 16. The sample matched evidence collected from a rape, which had occurred six years earlier. *Id.* at 441, 186 L. Ed. 2d at 16. The defendant was charged, tried, and convicted of the prior rape. *Id.*

¶ 94          The Supreme Court upheld the conviction with the admitted DNA evidence and held the defendant's "expectations of privacy were not offended by the minor intrusion of a brief swab of his cheek." *Id.* at 465, 186 L. Ed. 2d at 32. The Court held defendant's expectation of privacy was not violated in the "context of a valid

arrest supported by probable cause." *Id.* The DNA identification swab and the sample obtained was held to be a reasonable search as a part of the "routine booking procedure" for the State's interest in properly identifying an arrestee but also for the court to make "informed decisions concerning pretrial custody." *Id.*

### 1. Nature of Intrusion

¶ 95 Defendant was in the class of offenders sentenced under Fair Sentencing pursuant to N.C. Gen. Stat. § 14-2 between 1975 and 1978 and potentially impacted by this Court's decision in *State v. Bowden*. In preparation for possible early release, along with all potentially affected inmates, a blood sample was taken from Defendant without recorded objection on 28 October 2009 by DAC. This draw was taken pursuant to authority in N.C. Gen. Stat. § 15A-266.4 (2009). From this lawfully obtained sample, Defendant's DNA profile was created and sent to CODIS.

¶ 96 Forensic DNA testing analyzes certain predetermined parts within the chromosomes contained inside of the nucleus of all human cells. The Supreme Court of the United States explains the process as:

> The DNA material in chromosomes is composed of "coding" and "noncoding" regions. The coding regions are known as *genes* and contain the information necessary for a cell to make proteins. . . . Non-protein-coding regions . . . are not related directly to making proteins, [and] have been referred to as "junk" DNA. The adjective "junk" may mislead the layperson, for in fact this is the DNA region used with near certainty to identify a person.
> The term apparently is intended to indicate that this

particular noncoding region, while useful and even
dispositive for purposes like identity, does not show more
far-reaching and complex characteristics like genetic
traits.
      Many of the patterns found in DNA are shared
among all people, so forensic analysis focuses on repeated
DNA sequences scattered throughout the human genome,
known as "short tandem repeats" (STRs). The alternative
possibilities for the size and frequency of these STRs at any
given point along a strand of DNA are known as "alleles,"
and multiple alleles are analyzed in order to ensure that a
DNA profile matches only one individual.

*King*, 569 U.S. at 442-43, 186 L. Ed. 2d at 17 (citations and internal quotation marks

omitted).

¶ 97        CODIS is a national DNA database maintained by the FBI with all fifty states

and federal law enforcement agencies participating. *Id.* at 444-45, 186 L. Ed. 2d at

18. CODIS collects DNA profiles from local laboratories. The profiles collected

include "arrestees, convicted offenders, and forensic evidence found at crime scenes."

*Id.* at 445, 186 L. Ed. 2d at 18-19.

¶ 98        CODIS provides for the "standardization of the points of comparison in DNA

analysis," basing its database "on 13 loci at which the STR alleles are noted and

compared." *Id.* As stated by the Supreme Court, the "junk" nomenclature used may

"mislead the layman," but it is important to note the 13 CODIS loci "are from the

nonprotein coding junk regions of DNA, and are not known to have any association

with genetic disease or any other genetic predisposition." *Id.* (citation and internal

quotation marks omitted).

¶ 99      The non-consensual swab of the defendant's cheek constituted a search.  *Id.* at 446, 186 L. Ed. 2d at 19 ("Virtually any intrusio[n] into the human body, will work an invasion of 'cherished personal security' that is subject to constitutional scrutiny[.]" (internal citations and quotation marks omitted)).  The Supreme Court held: "A buccal swab is a far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek; and although it can be deemed a search within the body of the arrestee, it requires no surgical intrusion beneath the skin." *Id.* at 446, 186 L. Ed. 2d at 20 (citation and internal quotation marks omitted).

¶ 100      Here, Defendant had his DNA sample collected by a "venipuncture to draw blood." *See id.*  The Supreme Court of the United States stated this procedure is a more invasive intrusion into personal security and freedom from unreasonable searches and seizures than taking a buccal swab for Fourth Amendment purposes. *Id.*  While a blood draw is a further intrusion into personal security than the sample taken in *King*, this distinction alone does not *per se* make the intrusion unreasonable.

¶ 101      In *State v. Barkley*, 144 N.C. App. 514, 516, 551 S.E.2d 131, 133 (2001), this Court examined a blood draw from a suspect in a previous murder investigation, who had been arrested on a habitual felon indictment and required medical attention for an unrelated injury.  Law enforcement officers had approached the defendant to provide a sample multiple times, while he was in-patient at the medical facility and

after the immediate medical issue was resolved. The defendant relented and allowed police to draw a blood sample. *Id.* at 517, 551 S.E.2d at 133. The sample matched DNA evidence from a rape, which had occurred several months earlier. *Id.* at 517, 551 S.E.2d at 134. This Court found no error holding:

> It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person.

*Id.* at 519, 551 S.E.2d at 135 (citation omitted).

¶ 102      The Supreme Court of the United States recognized the intrusion from a blood draw is greater than that of a fingerprint or buccal swab, but held the intrusion of an intravenous puncture was "not significant, since such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 625, 103 L. Ed. 2d 639, 665 (1989).

### 2. Defendant's Status

¶ 103      At the time of the 28 October 2009 blood draw, Defendant was incarcerated in the custody of DAC under a life sentence for the first-degree felony murder of Bullock.

"[G]iven the realities of institutional confinement, any reasonable expectation of privacy that [a prisoner] retained necessarily would be of a diminished scope." *Bell v. Wolfish*, 441 U.S. 520, 557, 60 L. Ed. 2d 447, 480 (1979) (citation omitted). Unlike the defendant in *Bell*, Defendant was not a pretrial detainee, with the presumption of innocence, but rather someone under final conviction and serving a life sentence entered upon a unanimous jury's verdict, which was reviewed and upheld by a unanimous Supreme Court of North Carolina. *Womble*, 292 N.C. at 461, 233 S.E.2d at 538.

¶ 104  Inmates do not forfeit all Fourth Amendment protections while incarcerated. *Wolff v. McDonnell*, 418 U.S. 539, 555-56, 41 L. Ed. 2d 935, 950-51 (1974). "[T]he threshold determination of whether a prisoner's expectation is 'legitimate' or 'reasonable' and thus deserving of the Fourth Amendment's protection, necessarily entails a balancing of the security interest of the penal institution against the privacy interest of the prisoner[.]" *Wiley*, 355 N.C. at 603, 565 S.E.2d at 32 (citation omitted). In *Wiley*, the nature of the intrusion was screening of the contents of a letter. *Id.* The issues in *Bell* involved searches for contraband and weapons inside a facility. *Bell*, 441 U.S. at 557, 60 L. Ed. 2d at 480.

¶ 105  Unlike these cases, the search of Defendant involved a draw of an intravenous blood sample in preparation for potential release from prison pursuant to N.C. Gen. Stat. § 15A-266.4. Defendant was not singled out for individualized suspicion or

disparate treatment, but was within a class of inmates to be potentially released from custody prior to the expiration of their sentences. This intrusion is weighted against the government's interest in preserving an identification record of convicted felons for resolving past or future crimes. *Wiley*, 355 N.C. at 603, 565 S.E.2d at 32. Here, the governmental interests outweigh an individual's right to privacy while incarcerated and upon release.

¶ 106         As we previously held, the 28 October 2009 sample drawn from Defendant did not violate Defendant's Fourth Amendment rights. The sample and profile were lawfully retained in the State Crime Lab's control. Defendant does not have a privacy claim or an unreasonable search and seizure argument because, as the trial court also found, the sample was obtained and retained lawfully. *See Barkley*, 144 N.C. App. at 519, 551 S.E.2d at 135 (citation omitted). The confirmatory analysis of Defendant's profile did not violate Defendant's rights. Defendant's argument is overruled.

## IX. Ineffective Assistance of Counsel

¶ 107         Defendant argues his counsel's assistance before the Commission and the three-judge panel constituted ineffective assistance of counsel by failing to petition for expungement of his blood sample and results under N.C. Gen. Stat. § 15A-266.4. Defendant seeks the exclusion of the DNA profile as the remedy for the alleged ineffective assistance of counsel.

### A. Standard of Review

¶ 108     In order to show ineffective assistance of counsel, a defendant must satisfy the two-pronged test announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984). The *Strickland* test for ineffective assistance of counsel has also been adopted by the Supreme Court of North Carolina for state constitutional purposes. *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985).

¶ 109     To show ineffective assistance, Defendant "must show that his counsel's conduct fell below an objective standard of reasonableness." *Id.* at 561-62, 324 S.E.2d at 248 (citing *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693).

¶ 110     Pursuant to *Strickland*,

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693; *accord Braswell*, 312 N.C. at 561-62, 324 S.E.2d at 248.

¶ 111     When reviewing an ineffective assistance of counsel claim, "this Court engages in a presumption that trial counsel's representation is within the boundaries of acceptable professional conduct." *State v. Roache*, 358 N.C. 243, 280, 595 S.E.2d 381, 406 (2004) (citation omitted). Our Supreme Court stated it "ordinarily do[es] not consider it to be the function of an appellate court to second-guess counsel's tactical decisions[.]" *State v. Lowery*, 318 N.C. 54, 68, 347 S.E.2d 729, 739 (1986).

## B. Formal Inquiry

¶ 112     The State argues no constitutional right to an attorney exists in state post-conviction proceedings; therefore, a petitioner cannot claim ineffective assistance of counsel pursuant to the Sixth Amendment. The State relies on *Coleman v. Thomas*, 501 U.S. 722, 752, 115 L. Ed. 2d 640, 671 (1991) and *Davila v. Davis*, __ U.S. __, __, 198 L. Ed. 2d 603, 612 (2017). In *Davila*, the Supreme Court of the United States reaffirmed *Coleman's* holding that where an attorney committed an error in a state court post-conviction proceeding, and where the Sixth Amendment does not guarantee a right to counsel, the error cannot supply the cause necessary to excuse a procedural default to allow review. *Id.* at __, 198 L. Ed. 2d at 612.

¶ 113     Defendant parallels this issue to a criminal defense attorney who does not advise their client on potential collateral consequences of a criminal conviction prior to pleading guilty. *See Padilla v. Kentucky*, 559 U.S. 356, 368-69, 176 L. Ed. 2d 284,

295 (2010). However, counsel's failure to seek expunction is not a collateral consequence.

¶ 114 Defendant had a statutory right to counsel for the "formal inquiry" by the Commission and at the hearing before the three-judge panel. *See* N.C. Gen. Stat. §§ 15A-1467(b) and 1469(d). Defendant's counsel sought a finding of actual innocence at the Commission and dismissal before the three-judge panel.

¶ 115 A defendant cannot plead guilty without being informed of collateral consequences that might affect their taking the plea. *Padilla*, 559 U.S. at 371, 176 L. Ed. 2d at 297. In *Padilla*, the defendant was incorrectly told he "did not have to worry about immigration status since he had been in country so long." *Id.* at 359, 176 L. Ed. 2d at 290. The drug charges he pleaded guilty to made his deportation mandatory. *Id.*

¶ 116 As established above, Defendant did not have a statutory right to expungement under either N.C. Gen. Stat. §§ 15A-146 or 15A-148. Defendant's counsel does not have a duty to pursue a remedy unavailable at law. Under *Strickland*, Defendant's counsel's performance cannot be "deficient" for not pursuing a claim that is unavailable to him. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693.

¶ 117 Defendant's counsel at the two proceedings was seeking to establish his client's innocence and dismissal of his conviction. This counsel was not retained to pursue any further claim or action by Defendant, including a claim under N.C. Gen. Stat. §

148-82 (2019). The trial court properly denied Defendant's ineffective assistance of counsel claim. *Davila*, __ U.S. at __, 198 L. Ed. 2d at 612. Defendant's argument is overruled.

## X. Inevitable Discovery

¶ 118    The State argues even if the 28 October 2009 sample was unconstitutionally obtained from Defendant, it would be admissible under the inevitable discovery doctrine because the State had focused their investigation on Defendant. The State asserts the trial court erred in concluding the Todd homicide investigation had "stalled" and denied the State the opportunity to put on additional evidence towards their alternative theory for admission under inevitable discovery at the trial court.

¶ 119    The Supreme Court of the United States and the North Carolina Supreme Court have recognized and adopted the inevitable discovery exception to the Fourth Amendment's exclusionary rule. *Nix v. Williams*, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390 (1984); *State v. Garner*, 331 N.C. 491, 506-07 417 S.E.2d 502, 510 (1992). The inevitable discovery doctrine prevents the application of the exclusionary rule where:

> evidence which would otherwise be excluded because it was illegally seized may be admitted into evidence if the State proves by a preponderance of the evidence that the evidence would have been inevitably discovered by the law enforcement officers if it had not been found as a result of the illegal action.

*Pope*, 333 N.C. at 114, 423 S.E.2d at 744.

¶ 120        The State points to Detective Johnson's testimony that the investigation would have inevitably focused on Defendant, regardless of the CODIS match. Detective Johnson testified the investigation into Todd's murder would have focused on Defendant because: (1) Defendant and Todd both lived in the Creekside Apartments; (2) Defendant told investigators he knew Todd, lent her cigarettes, and gave her rides to the grocery store; (3) Defendant also told officers he had cut off contact when Todd told his then girlfriend, Myrie, he "was trying to get with her"; (4) the anonymous call to Pittsboro Police reporting Defendant had killed Todd because Todd had "confronted [Defendant] for hitting on her . . . , but just trying to have a relationship with her" and Defendant had "got upset and said that he would get Ms. Todd for telling [Myrie] on him"; and, (5) Todd's stepfather had already told investigators that Todd had told him, shortly before she was murdered, "there was a gentleman . . . [in] the apartment complex that had been harassing her and that was trying to - - to hit on her and it was just causing her some distress."

¶ 121        The trial court did not allow the State to present Detective Johnson's testimony to establish police had responded to disturbances or assaults involving Defendant and Myrie at least six times between March 2017 and August 2017. The trial court reasoned the Greensboro Police Department incident reports did not come to Detective Johnson's attention until after the State Lab told police about the CODIS hit and the retest to verify the match.

Pittsboro Police initially focused on Thel Riley as their suspect, but he was ruled out by DNA analysis. It was error for the trial court to deny the State the opportunity to present evidence to satisfy their burden to prove inevitable discovery. Nowhere does our precedent impose a temporal component to evidence subject to inevitable discovery, only that the evidence "would have been inevitably discovered" by police.

## XI. Conclusion

The trial court correctly concluded the 28 October 2009 sample was lawfully taken and retained and was not an unreasonable search in violation of the Fourth Amendment. Defendant was not entitled to expulsion and expunction under either N.C. Gen. Stat. §§ 15A-146 and 15A-148. N.C. Gen. Stat. § 15A-148 places the burden of petitioning for expunction on the movant, and not *ipso facto* upon the State.

Presuming the constitutionally of the statute and Defendant's burden to show prejudice, the lack of automatic expunction does not trigger or place "an unconstitutional burden on the defendant" in violation of the Law of the Land Clause in Article I, Section 19 of the North Carolina Constitution. North Carolina's lack of automatic expunction in the statute also does constitute a procedural or substantive Due Process violation. The trial court erred in suppressing Defendant's 28 October 2009 blood sample and DNA profile therefrom uploaded into CODIS.

¶ 125     The 28 October 2009 sample was not "fruit of the poisonous tree" from Detective Leather's interrogation and Defendant's confessions. The confirmatory analysis and the subsequent search of the blood sample taken 24 January 2018 were not a warrantless search lacking exigent circumstances. The trial court's ordered suppression on the violation of the Law of the Land Clause is erroneous and reversed. This matter is remanded for trial. *It is so ordered.*

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges MURPHY and GORE concur.